Good morning, and may it please the Court. Lee Tucker of the Federal Defender for Arizona on behalf of Maria Sanchez-Equihua. And I'd like to note that this case was tried and briefed by my esteemed colleague of the private bar, Arman Salis, who subsequently passed away. Ms. Sanchez was convicted of, on the charge of illegal possession of a firearm, possession of a firearm by an undocumented alien. And she asked this Court to reverse that conviction on two grounds. First, the denial of a requested jury instruction regarding innocent possession. And second, the partial denial of her motion to suppress. I'll begin with the suppression issue, and I would like to reserve two minutes for rebuttal. Before discussing, getting into the meat of the matter before the Court, I'd like to just review briefly the context in which these statements at issue were made. These were inculpatory statements by Ms. Sanchez to the effect that she had a gun. What we are looking at here is a woman, a 27-year-old, a mother of four, who had never had any encounters with law enforcement, and returns home in the middle of a weekday, a Tuesday, coming home from a doctor's appointment, to find at her apartment between 10 and 15 agents. It was a mixed force of DEA federal agents and State Task Force members conducting a search of her house. They were all in uniform. They were all with weapons. Some of them had masks on. In fact, the first person she encountered, Detective Solis, was masked during her discussion with him. Her apartment is on the second floor. She went up the steps and is stopped at a landing. It's about eight by eight feet. All these agents are there, and she's immediately asked, who is she? Please show ID. And then the lead detective comes out, Detective Chueva, and he proceeds to ask her why isn't she on the lease, what is her immigration status, and so on. Now, the district court correctly found that she was in custody. She was never permitted to enter the apartment. Excuse me. At all times, of those dozen or so agents, there were at least three in her immediate vicinity on the porch. Detective Ress was in the doorway, preventing her from entering the apartment. Detective Solis was on the porch, and a third agent was on the steps leading down from the apartment. She would have been on a landing just below the entrance to the apartment? Well, Your Honor, I'm glad you asked that. In the factual findings by the magistrate, he says it's below the apartment, but it's clear from all the testimony at the hearing and the trial that, in fact, and from the diagram in the government's answering brief, that, in fact, the landing is just outside the door. There's not a separating flight of stairs. So there's one flight of stairs, the landing. But we have an officer blocking the door, preventing her from entering.  And she's in a chair with her sister-in-law, her sister? Correct. Initially, her sister Veronica, who was at the apartment already, is there. An ambulance had been called for Veronica. She was six months pregnant and needed to go to the hospital. But, correct, Ms. Sanchez was seated in a stool with the other officers there. There was also testimony that the remaining officers were in and out of the apartment. The officer at the door is who? Officer Ress. He testified at both the suppression hearing and the trial. So she's seated just feet away from him? Correct. And there was also extensive testimony by Officer Ress, Officer Solis, and Ms. Sanchez that the people on the porch could see a great deal of the apartment, almost all of the living room, the dining area, which is where the police had set up their evidence area, and part of the den, and that they could hear everything. The door was open the whole time. And so that is the context in which the statement is made by Detective Cochise, who does not testify at either the hearing or the trial, that as he's walking by the door declares, I just found a shotgun under the child's bed, in the child's bedroom. Now, there's conflicting testimony as to whether Ms. Sanchez then immediately said, oh, I have a gun, or if first Detective Ress asked her, do you know anything about the shotgun, and then she replied, no, but I have a gun. And all the statements that she'd made to the earlier interrogation about her status and so on were suppressed, but the statement, I have a gun, was allowed in. As a consequence of that ruling, Ms. Sanchez then testified at trial to explain why she had made that statement. The issue really is, can that be, were those statements the result of the functional equivalent of interrogation? And the district court allowed the statement in, allowed the statement in, the spontaneous statement in? Correct, Your Honor. Okay. And the ruling for that, did you, were you allowed to ask about the, about whether Officer Russ had asked a question of her? Well, Your Honor, it's interesting. The magistrate in his findings said that the sequence was she overhears the statement about the shotgun, she says she has a gun, and after that, Detective Ress asks her about the shotgun. The district court overruled the magistrate's ruling, but did not specify whether he was adopting or rejecting the findings of fact. He overruled, he overruled only the question of custody. The finding of custody, correct. That's correct. Okay. So at trial, were you allowed to ask whether Officer Russ had asked her whether she had a gun? Defense counsel at trial did ask Officer Ress about those statements. So the conflict between the evidence that you've just pointed out as to whether she first spontaneously said, oh, I have a gun, or whether Officer Russ said, do you know anything about this gun, was before the jury. It was before the jury. However, the issue of whether or not her statements were the product of interrogation was not before the jury. That was decided prior to trial. Sure. But the question, the question as to whether or not, but the question of what kind of weight you give that would have been before the jury. Well, the testimony was presented to the jury. The jury was never asked to decide anything other than the fact did she possess the gun. So is the mistake here that the trial court didn't ask the jury to resolve that conflict? The mistake here was that the trial court didn't suppress the statement. But in order to suppress it, you are asking the judge to determine which of these two things is correct. Which is a legal decision for the judge to make. Okay. But then he's going to have to make a finding of fact as to which of these two people he believes, right?  But that, exactly, Your Honor. And that conflict. And the judge decides that against you. Well. So what is the problem? If the judge thought that she volunteered this statement first and not in response to a question from Officer Russ, where is the problem? Oh, well, the problem is even if that were the case. If it's in response to a statement from Officer Russ, then it's clearly would be, it would be a much easier case for us. If it's not, however, we submit it's still the functional equivalent of interrogation given the context. Your argument here is that you don't, you don't really have, you're not really relying on the fact of a conflict. You're really relying on the fact, you're going to accept the fact. Correct. Come by the magistrate, which is that she volunteered this statement while she was sitting feet away from Officer Russ with an open door with officers running all around through her apartment. I'm going to accept the finding that the sequence was that she made that statement prior to any questioning by Officer Russ, not that it was volunteered. I see I'm down to a minute and a half. I'd like to briefly make a few more comments on this point, which is to point out to the Court that all of the cases involving the functional equivalent of interrogation cited by the government in which it was found not to be the functional equivalent of interrogation are all cases where the defendant was Mirandized first. But would you just explain to me what the officer did? The officer who said I found a shotgun? Why was that reasonably likely to elicit? He wasn't even there, was he? He was at the doorway. He was at the doorway. Exactly. Was he looking at her? Did he make eye contact with her? No. So he may have been uttering this to somebody else. He may have been. But he should have known that it would be reasonably likely to elicit an incriminating response. There were a number of police there, right? Yes, there were. Was he supposed to write this on a whiteboard or something like that and pass a note to a friend? He can't say, hey, John, I just found, look what I just found under the crib. Your Honor, if the police had done what they should have done and Mirandized her, then we wouldn't have this issue. But when they choose to assume the risk of having someone in custody and not Mirandizing her, it changes the equation. And if you look at Innis, it reminds us that Miranda is concerned with that interplay of custody and interrogation. And the reason I think it's significant that all of these cases involved a Mirandized defendant is that that then puts the defendant on notice, and it makes it a little less likely that they're going to volunteer statements. I see that I'm out of time. What do you think is your best case for functional interrogation? What's the case you think is closest to your case? Well, Your Honor, I don't have a case that's extremely close to our case. I think that this is a sort of new area of the extreme coercive element and a mother who is implicitly being accused of having a shotgun under her child's bedroom and would one could expect. And as you know, the incriminating response doesn't have to be inculpatory. It can be any response. It can be exculpatory. It can be a denial. It can be anything. And it's the police should have known that that kind of a statement would be likely to provoke a response from her. And the fact that she was not Mirandized, it should have been suppressed. Thank you. I'm going to allow you a minute. I've taken much of your time. Thank you, Your Honor. I'm going to allow you a minute for a rebuttal. Good morning, Your Honors. Erica McCallum from the District of Arizona, representing the government in this matter. Just to clarify a factual issue that was raised by the defense here, as far as whether there was conflicting testimony regarding that spontaneous statement, actually at the suppression hearing, both the agent and the defendant testified that the defendant overheard Cochise's statement as he passed through the living room on his way to the kitchen with that shotgun to take it to the evidence collection area. She overheard that statement and she said, I have a gun. What's the big deal? Now, at suppression, the defendant's problem with that statement was that she said, no, no, my sister, Rosita, responded, there's no big deal. But I said, I have a gun. It was at trial that the defendant changed, and that's at excerpts of record 84 and 127. At trial, the defendant changed her story just a little bit and testified that after she and Ress overheard Cochise make that statement, I found a shotgun, that Ress turned to her and said, I thought there wasn't anything in the house. And she responded to that with her statement, I have a gun. That was at the trial statement? That was at record 544 at trial. Testimony? That was the defendant's testimony. Do you agree with the appellant that she was in custody? Do I agree with the finding that she was in custody? Yes. The government's not disputing that. And also to clarify, if you look at the opening brief, page 13, the only statement this defendant is challenging here is her spontaneous statement, I have a gun, what's the big deal? So all of the other statements that the defendant herself brought in at trial, she's not challenging that they were suppressed. She brought them in anyway, and she doesn't have an issue with those. It's an odd scenario. What is the reason that there were a number of people on the porch? Is that? On the porch were the defendant, her sister Rosita, and for a portion of time another sister who the ambulance had been called and detected her agent Solis was there dealing with the ambulance attendants and this third sister who had been originally found in the apartment. And you're not now disputing that they were all in custody? No. We're not. No. Is there a reason why they weren't merandized? They were, well, because they weren't being subject to interrogation. What was happening was that they were waiting on this porch while the search warrant was being executed. This isn't like the Craighead case where one of the people was taken into another room and asked a series of questions. This was simply they were waiting, they were sitting outside while the search warrant was being carried out. And, Your Honors, I was not able to locate any case law that says that when agents are executing a search warrant, they're not allowed to talk to each other about what they found. In fact, it makes sense that an agent would tell the other agents, I found a shotgun because there's a safety issue there. They need to know there are firearms in the apartment. Turning to one more point, to some extent, the entire issue is moot. Because even if there were error by not suppressing that single volunteered statement, it was harmless error. Because, first of all, the defendant herself introduced her own statement and all of the other statements that she had objected to in the suppression motion. She introduced. Doesn't she? Once the first one comes in, she really has got to come in and explain this, doesn't she? Well, that's a trial strategy decision. She could have not testified. She could have, her counsel could have attacked the credibility of the other agents regarding. But if we think that the district court erred and this statement should be suppressed, there's a whole series of things that occur after that that changes the trial strategy, doesn't it? Yes, there are. I mean, if you were the government, you would certainly like to know in advance that the statement was going to be suppressed because it would change your strategy, right? It surely would change defense's counsel strategy, right? I suppose that's true, although there are myriad ways the defense counsel strategy could have changed. One of her arguments in her opening brief is that she was forced to testify as a result of this decision. And I don't think that's the case at all. There are a lot of different things, different approaches she could have taken at trial. However, the harmlessness also comes in because of the overwhelming weight of the evidence at trial. If all of those statements had been kept out, there still would have been a conviction. And the factual basis for that is that the gun was found in the defendant's nightstand with her clothing and correspondence addressed to her. She stipulated at trial that she was an illegal alien. And there was also a jailhouse letter that was introduced, a letter from her to her husband saying, let's – here's the cover story we're going to use with regard to the firearm. So given all of that other evidence, even if there were error, it was harmless beyond a reasonable doubt. And if the ---- But during the execution of the search, there was a comment about another gun, right, a handgun? I'm sorry? It was a comment by the officers and I think by the defendant regarding a handgun that was found in addition to the shotgun, right? At some point after the volunteered statement, there was a conversation between two of the agents about whether a handgun had been found in addition to the shotgun. Now, did she make any comment after that discussion between the officers regarding a gun, whether it was a shotgun or a handgun? She had already made the comment that – she had already made comments that she didn't know anything about the shotgun, but she had a handgun and it was in her nightstand or in her bedroom. But she made more than one reference to a handgun without being questioned regarding it. In other words, she volunteered that. The testimony, the evidence, indicates that what happened was there was her initial voluntary statement, I have a handgun, what's the big deal, which then in turn elicited responses from different agents who asked her questions that she then answered. For example, Agent Ress said, where is the handgun, and she pointed to her bedroom. So the spontaneous, the volunteered statement was said first and then that did lead to questioning by the other agents, which the district court ordered suppressed. Thank you. So if the panel has no further questions, I would submit my brief and ask you to affirm. Okay. Thank you. Thank you, Your Honors. I would like to just point out, give you a site, 812 F. 2nd, 1329. It's an 11th Circuit case, exactly similar facts as Judge Bybee was commenting with the government, in which it was found not to be harmless error when the defendant, because of an error in a suppression ruling, later testified at trial. I did want to briefly discuss the denied jury instruction. I wanted to point something out. As I said, I was not original counsel on this case. Counsel had asked for this panel to request en banc review for the matter of the jury instruction on innocent possession of a firearm. In reviewing and preparing for the case, I realized that both, excuse me, U.S. v. Johnson, the Ninth Circuit case that disallowed that instruction, and U.S. v. Mason, the district court circuit that allows it, and the other circuits also that have published opinions on point, are all in the context of a felon in possession. And in particular, our case, U.S. v. Johnson, there's a great deal of discussion about the particular policy rationale for not allowing felons to have guns. And so I would encourage the Court to consider that. I'd be happy to do supplemental briefing, if the Court would like, on the issue of whether or not really this panel is precluded from taking up that issue, because now we're dealing with 922G5A rather than G1, which was the context in U.S. v. Johnson. I'd also like to point out there is trial testimony by Ms. Sanchez that she only made her statement in response to questioning by Agent Ress. That's at page, I believe, 535 of the excerpts of record. And Agent Ress's report, the report by Katherine Jackson of the ATF said that he had asked the question about the shotgun. So there is conflicting testimony in the record. Thank you. Thank you. We thank both counsel for the argument. Case is submitted.
judges: Timlin, Schroeder, Bybee